Barclay, and I represent the appellant, along with my co-counsel Brian Bisher, the appellant is Lee Simmons. The central legal issue in this appeal is whether the significant boundary expansion by the National Park Service on Lee Simmons' private property, which was done to reach a predetermined number of acres, was arbitrary under the Administrative Procedures Act. And let me just briefly frame that issue with just a few facts to put in context Mr. Simmons' objection. His objection is, he has lived in the Niobrara Valley his entire life, his family's been there 100 years, and he has, he is an outfitter. So he depends on the serenity and the beauty of the Niobrara River and its corridor for his own business, but it's also a matter of family legacy for him. And he has already contributed enormously in this effort with the Niobrara, because he has, as the government will tell you, he's not objected to the restrictions on his property south of the river. He's not objected to restrictions of his property in the Cornell Dam area. But he objects to this property, first of all, it's not on the river. Second of all, it was done and added merely as a device to maintain a certain number of acres. And when you look at the property itself, the one we're talking about here, there are no waterfalls, there are no endangered species, there are no fossils, there are no historic homes, there are no rare or exemplary or unique outstanding or remarkable values, which is the test that this court announced in Sokol needs to be present. They aren't present here. This action was taken by the government through their superintendent, Mr. Paul Hedren. Mr. Hedren was very much aware of this specific property. Mr. Hedren had corresponded with the Simmons about this property. He had walked on the property. He had talked to the people about the property. Mr. Hedren was deposed in this case, and he knew the single issue of the case was, are there outstandingly remarkable values on the property that's in question? And he prepared for three days, he said, and he testified, outside of the one-quarter boundary along the river, I find no outstandingly remarkable values. But he did say that he had done a preliminary boundary determination early on in the process, in March of 2002, and he had determined that he wanted the number to be made the same. He made changes after that. He made some reductions in some landowners, but he decided he wanted to maintain this number. Now, the district court considered this argument in another context with respect to another landowner, and the district court found you can't do that, and we, of course, agreed with the district court on that. You can't just arbitrarily decide you want a number of acres to be selected, and that was the problem in this decision, and why we're here on appeal. But now, let me be clear, the district court already gave you relief on 25 acres, right? That is true. And the rationale of the district court was they were just trying to keep the same total numbers, so they took 25 here and took 25 there, right? Yeah, the district court actually very specifically said that because the National Park Service did not show the boundary change was made for the purpose of protecting and enhancing the ORVs, the Outstanding Memorial Value, but to maintain the various acres at a certain number, it was arbitrary. And that's not an issue on this appeal, right? It is not, because it was already decided, and it's not been... So what's the acreage that's... How much of Mr. Simmons' land is left outside of the 25 acres that is still within the boundary as set by the Park Service? Judge Shepard, it's about, we think, about 75 acres in this plot, and we've actually shown you some maps in the briefs that both counsel have to identify this specific area. And if you look through that area, you'll see, even from the maps, there's nothing identifiable specifically. But more importantly, in our judgment, Your Honor, this court should look to, in terms of its standard review, so let's focus on that for a minute. The standard review here, of course, is that you sit just like the district court. This is denotable. And you're guided by this whole court's decision in Sokol. And in Sokol, this court held that the National Park Service had failed to apply the relevant statutory authority in making its decision. It selected land for inclusion in the Niobrara City River without identifying and seeking to protect the outstanding move from Mark Lex. And in this case, first of all, as I mentioned, this was just an arbitrary movement and extension of property on the land. And that's the primary objection. Well, you've said that several times. What is the evidence that that is the sole reason for, you're talking about the 75 acres, correct? Yes, Your Honor. And we've got a factual record on the 25. Why? Why should I, why should this court say, yeah, you're right, you should treat that the same as the 25. Well, first of all, Mr. Hebron testified specifically, and I'll give you the site in that he raised the boundary for the purpose, this entire boundary for the purpose of maintaining an acreage limit at 23,074 acres. That's what he said. And on summary judgment on this issue, because I want to address something I know you raised here. On summary judgment at page 48 of our brief, we raised this very specific issue. And we said that we made objection because the National Park Service seeking to justify its action for maintaining a predetermined number of acres of ORB. The district court down below identified this. On page 20 of the district court's opinion, you'll notice the district court set out four arguments. It said Mr. Simmons argues, and he put four arguments there. First one was of which, number, I'm sorry, number two was which the desire to reach a certain number of total acres, 23,074. Then he goes on and number four, he said, and separately, because there was some special differential treatment for other landowners, and we identified a Mr. Krueger, who it was clear to us had been treated, treated specially, and he is the one who had the 25 acres that we talked about. But the district court just simply mistakenly did not notice that the other acreage was also subject to the boundary expansion. And that's what our objection was. So we asked the district court to take that into account and to say you can't arbitrarily raise the boundary for any reason as they did here, not just for Mr. Krueger, but in this area as well. And we outlined that argument, but the district court simply focused its attention on the 25 acres. Let me ask you something that would make this case easy for me. In SoCo, did we really say, this court really say that 60 to 70% of all the land in this area is ordinary, unstriking, and probably doesn't have ORVs? Did we say that? You did. Okay, how can you tell me how this land we're talking about is within that 60 to 70%? Well, I can tell you this, that the district court noticed and the record in this case will identify this area as filled with ponderosa pines. This particular property shows that the record, there was a Ms. Thompson who testified in this case, identifying the foliage in the area, it also falls within that same space. And it is, that's what this area consumed. Those who've been on the Niobrara know there are some beautiful spots. There's Smith Falls, there's Berry Bridge is a beautiful spot. There's some beautiful cliffs and vistas that Mr. Simmons will tell you, you know, help make his Niobrara what it is. But this is off the property and off the river. And off the river, there are just simply unstriking and ordinary ponderosa pines. Well, to the extent we're doing this de novo, you know, the last case we had photo IDs. Do we have any pictures here? You have, there are some pictures, I believe, in the record here about the property. Did you identify those in your brief? You gave us good, you know, maps. Yeah, I don't know. I don't know you gave us pictures. There was actually some photos, I think, that were identified maybe in the Applebee's brief. But we basically depended on this case on the testimony of the person who knew more about what this was on this property than anyone besides Mr. Simmons. That was Mr. Hendrick. And the testimony was clear that there were no outstanding or remarkable values. There's some other testimony in the record that identified the foliage. But I don't know if there is a specific photo of this particular 75-acre plot. There was a finding, though, of a rim-to-rim outstandingly remarkable value, correct? So to say that there is none in the record isn't quite accurate. Well, Your Honor, Judge Kelly, they did say that there was 150,000 acres, is the way the government describes this, as outstandingly remarkable values, and rim-to-rim. And our position is, is that there really can't be outstandingly remarkable values of this type of landscape for 150,000 acres. That is double the size of the city of Omaha. It's double the size of the city of St. Louis. It's triple the size of the city of Cedar Rapids. And it's getting on to be about the size of Kansas City. And so this is in a gigantic area that there was no specific identifications that were... Well, isn't that the point? If they identified them, just the area is not a limiting factor, is it? Isn't the real question whether these features, these values, are specifically identified within the area? And justification given for there, for example, maybe there's more area needed than just that feature in order to protect it. Isn't that the real problem, that there's a lack of specific identification within the area? Precisely, Judge Shepard. They don't say what specifically is the outstandingly remarkable value. As this Court, again, said in Soto, you said it has to be rare, exemplary, unique. And there's only one thing that can be unique, as the Court pointed out. And this brushing with a wide brush and saying 150,000 acres in this area  you don't need the National Park Service. You don't need them to do anything. If everything is outstandingly remarkable value, just about anybody can walk by and say, well, here's where the boundary is going to be. That's not the intent of the Congress. And that's not the intent of the statute or what we were trying to do in the Niagara. We're trying to protect the outstandingly remarkable values. Everybody agrees with that, especially Mr. Simmons. But that's not the issue here. The issue here is whether they should be able to expand their boundary to a point that it takes over his property unnecessarily for the protection. I see that I'm into my rebuttal time. If it's all right, I'll use the balance in a moment. You certainly may. Ms. Wagner? May it please the Court. I'm Lynette Wagner, Assistant U.S. Attorney. And I am Robert Coleman, Assistant U.S. Attorney, representing the United States, the National Park Service, and the Secretary of the Department of Interior appellees in this case. The National Park Service undertook a seven-year review in its second general management plan to determine the outstandingly remarkable values found at the Niagara National Student River. And the service chose a boundary that would best protect and enhance those values. Mr. Simmons' property is adjacent to the Niagara River and lies between the Fort Niagara National Wildlife Refuge on one side and Smith Falls State Park on the other side. The service correctly identified the river values and included Simmons' property that contained those values within the river boundary. As Mr. McClain mentioned, this Court reviews the final boundary decision of the National Park Service to de novo, and it must uphold that decision unless it finds the decision was arbitrary and capricious and abuse of discretion or otherwise not in accordance with the law. In the second general management plan for the Niagara National Scenic River, the service fully complied with this Court's decision in Sobel v. Kennedy. The service used the correct legal standard under the wild and scenic rivers to determine the outstandingly remarkable values. The service did a painstaking reanalysis of the river's values after Sobel, reviewing the scientific and technical literature, conducting a brand new viewshed analysis and resource analysis, and incorporating public comments into its 9,000-page administrative record for the plan. Does the service rely largely on the rim-to-rim ORV? And if so, how is that not just simply no determination at all? If it all is rim-to-rim, outstandingly remarkable, how can that be the standard? In determining that three of the five values of the river, the scenic, the geologic, and the fish and wildlife values were rim-to-rim, the service relied on input from the scientific and technical literature and from the public. 150,000 acres recognizes that this river valley, that this river cuts through four different geological formations. It recognizes, the Wild and Scenic Rivers Act does not require that ORVs be identified as a specific tree, a specific rock, or a specific bird. At the Niagara, what the scientists tell us, and what we understand, is that there are six different ecosystems that converge in this 150,000 acres. And it's based on the geology that cuts through about 300 acres of ground and four formations. It includes the habitat for about 160 plant and animal species that are at their furthest reach in the United States within this valley. So it's this intermixing and sometimes creating a habitat where species are hybridizing is very unusual as a biological resource. And that, again, is not just a particular tree or rock. It's within this entire area. The service knew it couldn't protect 150,000 acres within the boundary because the boundary's limited to a little over 24,000 at a maximum. Another factor on Mr. Simmons' property that was added on January 9th of 2003 to the boundary is that it contains a significant river lewishit. This court in Sokol criticized the service last time because it didn't, it drew a hypothetical lewishit. And I believe that's what Judge Ben was referring to when he talked about 60% or 70% that is not significant or is not outstanding. In this case, what the service did is literally they put rangers on canoes and floated them down the river with large topographical maps of the river. And the rangers would draw the lines on the map as they floated to what they could actually see, what was the literal lewishit of what could be seen from the river. And they sure went back and did some ground truthing and some additional checking of that lewishit line. But they drew the lewishit line consistent with this court's decision in Sokol to cover the actual lewishit. Is that in dispute, whether that is a factual matter, was the lewishit? I don't believe that that is in dispute. The lewishit in the map shows up as the red line from the river. And most of Mr. Simmons' property, as you can see in map C in the appellee's brief on page 25, contains this red lewishit from the river. And the green trees also are part of this property. So it's clear that Mr. Simmons' property, where it's located, does contain outstandingly remarkable values. The choice of where to draw that line, and perhaps now I should go to the issue that was raised about keeping the number of papers constant, because that was raised. After the, this was a process with the Park Service, and it started with sending out newsletters, reviewing the scientific literature, and doing their own analysis. The Park Service then went out to the public with some pre-drought boundary lines and pre-drought work on the ORBs. At that time, they established the acreage in the preferred boundary at 23,075 acres. The Park Service decided to keep the acreage amount under that preferred boundary constant, because they knew that they could not protect all of the ORBs. They couldn't protect the $150,000, the 150,000 acres of the scenic geologic and fish and wildlife resources, and they knew they couldn't even protect the entire viewshed, which was over 39,000 acres. So instead, they kept the focus of the discussion not on the numbers and whether the number was up 25 acres one day and down 30 acres the next day, and they kept the focus of the discussion and their debate about where are the best values, where is the highest concentration of these values along the river. Now, counsel, you're contradicting what the district court says on page 24, where it says NPS are readily admits making a conscious decision to keep the numbers the same, and they quote several people, they have a whole series of findings there, and what you're saying does not accord with what the district court found. I believe they kept the number of acres constant, and we admit that, but what they focused on was now which acres within the Niagara River Valley would have the highest concentration of these values. And so in increasing the boundary on January 9, 2003, to include more of Mr. Simmons' property within the boundary, they specifically listened to the public who was saying, focus on the western third of the river, that's where the greatest scenic and that's where the greatest recreational opportunities are. They listened to, they received input from the University of Minnesota visitor study in September of 2002, which clearly identified the importance of Berry Bridge as a landing point or a major launch site onto the river. Mr. Simmons' property was added in January 2003 as the first large northern view shed downstream from the Berry Bridge. I'm behind you again. But footnote 11, this court said you should not select the boundary simply to maximize the number of acres, and the district court said you did it, and said that that's arbitrary and capricious. I understand that he limits that to the 25, but your opponent says that that should have been done for the whole process. And I respectfully disagree. Tell me why, because you're on the edge of Sokol and on the edge of the district court. Right, because this property contains the values that the court, that the service determined were outstanding and remarkable. The 25 acres did not contain view shed in particular, and this property does contain a large quantity of river view shed. So I think the view shed in particular on this January 2003 is the big factor. There are also trees, and I understand that Mr. Simmons' concern that he feels he was treated differently from other landowners, but if you look along, even within the Sparks Quadrant, if you go further to the east or the right-hand side of the Sparks Quadrant, you're going to see where the service drew the boundary close to a mile north of the river. Much further north of the river than what it is on Mr. Simmons' property to capture some of these ponderosa pine trees that are on Mr. Simmons' property. You will also see that the service on Map C went further north from the river than it did on Mr. Simmons' property on another landowner's property to capture this draw and this change in elevation that was going, and some trees that were going down into the Niagara. So he was not treated differently from other landowners. How about Mr. Kruger? If we look at Kruger, we look at Simmons, are we going to see that they really were treated very differently? And otherwise, they look about the same. Mr. Kruger's land, if you look closely at the record from the district court in here, shows that he asked to have about 25 acres removed from his property where he had some cabins. If you look at where that property is in relation to the river, you'll see that the service has only drawn that line up far further north on Mr. Kruger's land, containing far more acres on Mr. Kruger's land than it ever did on Mr. Simmons' ground. So, Jerry, the 25 acres in particular is where you're going to see a huge increase, and that's primarily to capture the trees. Now, this is how I understand your argument, and I want you to correct me if this is a misstatement. I understand the argument of the National Park Service to be that everything within this valley, rim to rim, is outstandingly remarkable without the necessity of identifying anything by specific location or uniqueness. And, therefore, if that's true, then the Park Service can simply set the boundary at its will at any location, rim to rim. Is that an accurate statement of your position? In looking at the rim to rim determination, the Park Service did find that that definition of the line, which in itself is identified on the line, the rim to rim, is where the ecosystems were merging, where the natural resources and habitat that is unique and makes this river a biological crossroads, were within the rim. So that is why the rim to rim definition of the values is appropriate. Wellensian rivers doesn't limit the number of acres that the values contain. This court of the local recognized that drawing the boundary, you're probably not going to be able to capture all the values because it could exceed the number of values. What the Park Service did in determining the rim to rim values is they relied on the science and then relied on their own continuing analysis of the scope of the breadth of those values, which did basically cover much of the entire valley. Well, in the plan, is anything identified by specific location? Yes, the viewshed is specifically drawn as part of the recreational value. Well, I mean, that's like massive amounts of acres, is it not? It's about 39,000 acres. That just defines the area that you can see from the river, right? Yes, primarily it's from the river. Is there anything other than that that's identified by specific location? Yes, you can look specifically at where the trees are, and the trees are really important, especially on Mr. Sennett's property. It's the ponderosa trees. They're identified in the topographical maps. They're also identified- And they cover the entire valley? Pardon? They cover the entire valley? They don't cover the entire valley. They are present in significant swatches throughout the valley. And are those locations identified? Yes, that's actually in the general management plan. It's under the maps. It's identified both in the writing description of the scenic value and the maps that are fold-out maps in our appendix that show where the scenic values, primarily the trees and vegetation are located. And what about anything that's unique? The Fusoco opinion made specific note of the fact that if it's unique, it's one of a kind. Is anything unique, specifically identified and located for the reader of this plan? The uniqueness is the actual merger of these six ecosystems. That is unique within the Great Plains region of the United States, and it is why, again, it is broader. It's not identifying a particular waterfall or identifying a particular rock cliff. It's looking at what makes this corridor unique within the Great Plains, and that's the merging of the six ecosystems and creating the habitat, which is all based on the geology. Counselor, I know the district court regularly refers to filing number 111 for the footnotes and for many of the facts, and some references apparently to plaintiff's property. What is filing 111 in the district court? Do you have any idea what that is? Don't worry about it. Our coach, that's one our coach can figure out. Go ahead. No, that's okay. It is throughout the opinion. I know that you mentioned, you asked specifically about whether there were pictures. Yes. I did want to at least raise your attention that there are some pictures from plaintiff's website that are in the record, and those I think are helpful to see from this path and how he looks to the river. If I may just read, my time has expired. May I just briefly conclude? Yeah, you have a sentence or two, sure. The decision to include Simmons property within the boundary, specifically what was added in January 9th, 2003, was clearly justified to protect and enhance the multiple values on Simmons property. This court should therefore defer to the agency's decision, both for our generation, for the next generation, for generations to come, and dismiss Mr. Simmons' appeal. Thank you. Thank you, Ms. Wagner. Mr. McClain, back to you. Thank you, Your Honor. Filing number 111 is the government's brief. We identified that. I believe that we had made objection that the district court was relying heavily on the brief. Yeah, but as you know, that refers to all kinds of other stuff, exhibits and all. So it's not too bad. Go ahead. Proceed. Counsel, what's wrong with this response that if you have an area that's so outstanding that it's impossible and needless to identify particular locations geographically? I think you need to do it, Judge Shepard, because that's what the statute says. That's what this court in Sokol identified. You know, a river is different than a park. We have a river corridor, and the Congress decided we do want to protect some lands. There's some vistas. There'll be waterfalls. There might be attractive bridges that are truly outstanding and remarkable, and there are in the Niagara River, and that's what they want to do. But it was very restrictive. You know, 320 acres for the mile marker on the river. This was not intended to be expansive. That's why the standard is so high. No one denies that this is a very high standard, and it should be. There was a reason for it. And I want to segue to something that was also said about there is some identification of U-shed on our property. This court, under its standard review, and we cited the Starfruits v. United States case, which allows this court to evaluate whether there was an unreasonable judgment in weighing the factors involved. And that's really what is involved here when we're talking about the values on this particular property, which does not contain rare or exemplary or unique property values. And so I think you should exercise that authority in your de novo review and take that into account. But really, I want to end with talking about what Sobel talked about in terms of a post-hoc rationalization. That's what the Supreme Court called it in the American Textile Manufacturers case, where you come and you make a decision later that is contrary to the first one you made. And that's what happened here. They made a decision here. It was simple. They arbitrarily raised the boundaries so they could meet a certain number of acres. It wasn't for because there was outstanding or remarkable values. That borne the concept of 150,000 acres of rim-to-rim outstanding or remarkable values. That's how you get there. And I can just say this for those next generations. Mr. Simmons has done a lot for them by his own protection and his own stewardship. But even more than that, when this Court rules in his favor, which we certainly hope that it will, if it rules in his favor, there will be 23,000 instead of 23,074 acres protected by the National Park Service. This is very limited, but this is critically important because this goes to application of the law. And we ask this Court to apply the law here and to reverse that part of the order from the Park Service. We ask that it instruct the District Court to remand to the Park Service with instructions to put the quarter-mile boundary on the river exactly where Mr. Hedren said it should be. Thank you very much. Thank you both for your arguments. Case number 16-3899, Simmons v. Jarvis, is submitted for decision. At this point...